NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

Francisco HERRERA-GENAO,

Petitioner,

v.

UNITED STATES OF AMERICA,

Respondent.

Civ. No. 12-6119

**OPINION**

THOMPSON, U.S.D.J.

Petitioner Francisco Herrera-Genao, a federal prisoner, has filed this petition, pursuant to 28 U.S.C. § 2255, to vacate, set aside, or correct his sentence. (Doc. No. 1). Respondent United States of America opposes the petition. (Doc. No. 10, 31). The Court has issued the Opinion below based on the parties' written submissions and the testimony given during evidentiary hearings held on March 26, 2013 and June 26, 2014. (Doc. No. 25, 40). For the reasons stated herein, the petition will be denied.

BACKGROUND

Petitioner Herrera-Genao claims that he suffered ineffective assistance of counsel in the representation and advice he received from his retained attorney Martin Matlaga from the time Matlaga was first retained by Petitioner's family until the end of trial. The Court will focus its inquiry on: (1) Matlaga's performance during plea negotiations, (2) his failure to move for a severance from Petitioner's codefendants, and (3) his decision to waive a competency hearing.[1]

---

[1] Petitioner has also purported to preserve his arguments concerning the interpretation of 18 U.S.C. § 924(c)(1)(A); however, he has not asserted this claim. Therefore, the Court will not consider this issue.

1

1. **Procedural History**

On October 1, 2012, Herrera-Genao filed a petition pursuant to 28 U.S.C. § 2255, seeking to vacate his sentence. (Doc. No. 1). On October 2, 2012, this Court advised Petitioner of his rights under *U.S. v. Miller*, 197 F.3d 44 (3d. Cir. 1999). (Doc. No. 2). On March 26, 2013, this Court held an evidentiary hearing addressing Herrera-Genao's claim that he received ineffective assistance of counsel during plea negotiations. (Doc. No. 13, 25). On May 31, 2013, Herrera-Genao filed a Supplemental Brief in support of his petition that appeared to raise another claim of ineffective assistance stemming from Matlaga's failure to pursue a competency hearing. (Doc. No. 36). On June 26, 2014, the Court held an additional evidentiary hearing to receive the testimony of former Assistant United States Attorney Charles McKenna with respect to the existence of a plea offer. (Doc. No. 40).

2. **Facts**

Between February and March of 2007, Herrera-Genao and others robbed a series of banks. *United States v. Herrera-Genao*, 419 F. App'x 288, 290 (3d Cir. 2011). On April 5, 2007, FBI agents attempted to arrest Herrera-Genao and his codefendants in a parking lot while they were preparing to commit another bank robbery. (Presentence Report ("PSR") ¶ 43; Doc. No. 30 at 7). During the attempted arrest, one FBI agent was tragically killed by an accidental discharge from a fellow agent's weapon. (*Herrera-Genao*, 419 F. App'x at 290). Amidst the commotion, Herrera-Genao fled the scene and hid in the woods, but was captured by police the next day. (*Id.*). As Petitioner was being arrested, he purportedly begged the arresting officers to shoot him. (Petitioner's Appendix (hereinafter, "App.") at 185). Later while in custody, Herrera-Genao was apparently distraught and attempted to commit suicide. (App. at 3).

On April 6, 2007, Herrera-Genao was charged with one count of attempted bank robbery and one count of use of a firearm in relation to a crime of violence under 18 U.S.C. § 2113 and 18 U.S.C. § 924(c)(1)(A)(iii). (Doc. No. 31 at 3). On June 1, 2007, he was charged by indictment with one count of conspiracy, five counts of bank robbery, and five counts of use of a firearm during and in relation to a crime of violence. (*Id.*). On February 1, 2008 and October 13, 2008, he was charged by superseding indictments containing similar charges. (*Id.*).

Herrera-Genao's family retained Martin Matlaga to represent him as counsel in this matter. Matlaga represented Petitioner in the period leading up to and through trial. After Matlaga was retained, the Court ordered that Herrera-Genao be examined for competency to stand trial. Matlaga also sought additional medical opinions from experts as to Herrera-Genao's mental condition with regard to competency or insanity.[2]

Based on these examinations, Herrera-Genao was diagnosed with multiple mental and emotional disabilities. Daniel M. Greenwald, M.D. diagnosed Herrera-Genao with: (1) major depression with psychotic features, (2) borderline mental retardation, (3) post-traumatic stress disorder, and (4) possible brain damage due to head trauma. (App. at 186). Greenwald explained that Herrera-Genao also suffered from auditory hallucinations ("hearing voices"). During the examination, Herrera-Genao "showed obvious difficulties with concentration and memory" and could not remember his lawyer's name. (App. at 186-87). Dr. Edward Dougherty,

---

[2] Competency refers to whether a defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." *Godinez v. Moran*, 509 U.S. 389, 396 (1993). In contrast, insanity "is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense." 18 U.S.C.A. § 17.

3

a forensic psychologist, found that Herrera-Genao's IQ was in the bottom one percent of the population, a mental capacity roughly equivalent to an eight-year-old child.  Dr. Dougherty also found that, as a result of Herrera-Genao's diminished mental abilities, he had difficulty remembering and processing new information.

After receiving these reports, Matlaga waived the competency hearing on December 20, 2007.  (App. at 30).  Evidently after speaking with Dr. Dougherty, who opined that Herrera-Genao could not meet the federal definition of insanity, Matlaga also advised the Court that he did not plan to pursue the insanity defense and would instead seek a plea offer.  (App. at 147).

At some point between December 2007 and February 2008, Matlaga discussed with Assistant U.S. Attorney Charles McKenna the possibility of a plea offer.  McKenna testified that these discussions were only preliminary and that a plea offer idea was contingent on McKenna subsequently receiving clearance from the victims and approval from the United States Attorney, Christopher Christie.  In early February 2008, Matlaga met with Herrera-Genao to discuss what he apparently believed to be a potential plea.  (App. at 98).  During that meeting, Herrera-Genao stated that he would only take a plea of 10-25 years.  In the evidentiary hearing, Matlaga also testified that Herrera-Genao was "never ready to plead guilty, never, unless he got 10 or 15 . . . ." (App. at 153).[3]  On February 27, 2008, Matlaga explained to Herrera-Genao that the Government rejected his request for a plea of 20 years.  (App. at 251).

On October 21, 2008, Matlaga informed Herrera-Genao that the Government might accept a 45/37 plea[4] if Matlaga or the U.S. Attorney's Office could "convince the FBI to approve

---

[3] Matlaga also testified that Herrera-Genao's "position [. . .] consistently was that he wanted to go to trial," unless he got a plea of less than 25 years.  (App. at 153).
[4] Matlaga and Petitioner refer to the offer as a 45/37 year offer.  This term appears to refer to a 45 year sentence with a possibility of release within 37 years.  While Petitioner could not have plead to this exact number of years under the Sentencing Guidelines, this 45/37 offer could have

4

it." (App. at 253). Matlaga advised Herrera-Genao to take the possible offer and explained that the insanity defense "is very weak in light of everything else in the case." (App. at 253). Matlaga learned that Herrera-Genao had rejected the offer through Herrera-Genao's cousin, whom Matlaga had asked to encourage Herrera-Genao to take the offer. (App. at 38).

When it became clear to Matlaga that Herrera-Genao was going to trial, Matlaga began to subpoena witnesses in an attempt to support an insanity defense. On November 24, 2008, after Herrera-Genao had already rejected the plea offer idea, the Government moved to preclude expert testimony concerning Herrera-Genao's insanity defense on the grounds that Matlaga did not comply with the Federal Rules of Criminal Procedure. (Doc. No. 30 at 27; *see also* Fed. R. Crim. P. 12.2a (setting forth notice requirements for experts)). The evidence and the defense were ruled inadmissible shortly thereafter. (*Id.*).

The jury trial began on December 1, 2008. (Doc. No. 31 at 3). Herrera-Genao was convicted on all charges on December 10, 2008. (*Id.* at 4). On May 11, 2009, Herrera-Genao was sentenced, pursuant to a mandatory sentencing scheme, to 1,407 months in custody. *Herrera-Genao*, 419 F. App'x at 291. On March 24, 2011, Herrera-Genao appealed the conviction and sentence. (*Id.*). The Third Circuit affirmed his conviction and sentence. (*Id.*).

Petitioner now appears to bring three claims. In the present habeas petition, Herrera-Genao argues that "[t]rial counsel's erroneous legal advice on the federal standard for insanity, and his failure to communicate with his client, led Mr. Herrera-Genao to go to trial and to reject a plea offer of 45/37 years." (Doc. No. 30 at 18). Herrera-Genao also states that counsel's

---

been honored by Petitioner's agreeing to plead guilty to a count or counts that would expose him to a certain guideline range that included 45 years. The Government and Petitioner could also have advocated for 45 years as the appropriate sentence within that range.

failure to sever his case caused prejudice. Finally, Petitioner's supplemental brief appears to claim that counsel was ineffective in failing to pursue a competency hearing.

## ANALYSIS

### 1. Legal Standard

Under 28 U.S.C. § 2255, a prisoner in federal custody may move to vacate his sentence if it was "imposed in violation of the Constitution or laws of the United States." *See U.S. v. Seeley*, 574 Fed. App'x 75, 78 (3d Cir. 2014) (quoting 28 U.S.C. § 2255(a)). Here, Petitioner claims a violation of his Sixth Amendment right to counsel. A defendant seeking to show that his counsel was constitutionally ineffective must meet a "highly demanding" standard. *Lockhard v. Fretwell*, 506 U.S. 364, 378 (1993). To prevail on a claim of ineffective assistance of counsel, a prisoner must show: 1) his counsel's performance fell below an objective standard of reasonable professional assistance; and 2) that counsel's deficient performance prejudiced the defense, meaning there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–94 (1984).

### 2. Counsel's Plea Negotiation

Herrera-Genao asserts that Matlaga gave him improper advice about the merits of an insanity defense during the plea negotiation process. Before deciding whether to plead guilty, a defendant is entitled to the Sixth Amendment right to "the effective assistance of competent counsel," which is evaluated under the two-part *Strickland* standard. *Padilla v. Kentucky*, 559 U.S. 356, 364 (2010).

*A. Counsel's Performance*

To satisfy the first ineffective assistance prong, a petitioner must show that "counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed the defendant by

6

the Sixth Amendment." *Strickland*, 466 U.S. at 669; *U.S. v. Sanders*, 165 F. 3d 248, 250 (3d Cir. 1999) (Petitioner must show that "counsel's performance fell below an objective standard of reasonableness under prevailing professional norms."). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

Matlaga's allegedly deficient performance in the plea process is based on his: (1) advice on the merits of the insanity defense and (2) advice on the merits of the insanity defense, in light of Petitioner's mental limitations.

i.  Advice on the Merits of Insanity Defense

Petitioner argues that counsel incorrectly advised him on the strength of the insanity defense, causing Petitioner to have an unrealistic view of his chances at trial and mistakenly reject the plea offer. Even though Matlaga informed Petitioner several times in the period leading up to trial that an insanity defense was "very weak" and advised him not to rely on the defense, Herrera-Genao argues that this advice was flawed because the insanity defense was more than "very weak." App. at 253. But the record shows that, while the insanity defense was eventually disallowed, at the time Matlaga communicated the plea offer idea to Petitioner, an insanity defense was at least plausible based on the facts.

Dr. Greenwald found that Petitioner suffered from psychotic features, brain damage, and post-traumatic stress, the combination of which could possibly fall under the category of "severe mental disease or defect." *See* 18 U.S.C.A. § 17; App. at 186. Petitioner also begged the

7

arresting officers to shoot him and later attempted to commit suicide, perhaps suggesting an inability to appreciate the nature and quality of his actions. App. at 3, 185. Based on these facts, a reasonable lawyer could have believed, at this point in the case, that a jury might find that Herrera-Genao met the definition of insanity.

Therefore, while Petitioner has shown that the insanity defense was not strong, he has not shown that the defense was so likely to fail that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, especially considering evidence such as the auditory hallucinations and mental confusion Petitioner apparently demonstrated after arrest. *See* Doc. No. 30 at 3; *Sanders*, 165 F. 3d at 250; *Strickland*, 466 U.S. at 690 ("a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct"); *id.* at 689 ("Judicial scrutiny of counsel's performance must be highly deferential.").

 ii. <u>Advice on Insanity Defense to *this* Client</u>

Petitioner also argues that counsel erred by failing to properly account for Petitioner's mental difficulties when advising him on the insanity defense. Herrera-Genao claims that, even if his counsel's advice would be sufficient to inform an average client that the insanity defense would likely fail, his advice could not adequately inform *this* client, a man of significantly less than average intelligence and emotional capacity, that the defense would fail.

The record suggests that Matlaga's assistance as counsel, while conscientious and likely sufficient for the average defendant, was deficient for a defendant of Herrera-Genao's mental and emotional condition.

  *a. Standard for Advice to Clients with Impairments*

8

Generally, "defense counsel has the duty to [. . .] 'promptly communicate and explain to the defendant all plea offers made by the prosecuting attorney.'" *Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012) (citing ABA Standards for Criminal Justice, Pleas of Guilty 14–3.2(a) (3d ed. 1999)). In making these communications, the attorney must take steps to "explain [the] matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representations." N.J. RPC 1.4(c). While the rules do not require that the attorney engage in any specific forms of communication or use any specific means of explanation, the rules do require that the attorney communicate with the client sufficiently so as to enable him to meaningfully participate in his defense and make informed decisions. *See* N.J. RPC 1.4(c); Comments to N.J. RPC 1.4(c) *as quoted in* 1 N.J. Prac., Court Rules Annotated App. IV, Guide. 1.4 (SUPP 2014) ("clients must be sufficiently informed to be able to participate actively in the decisions that are made during the course of the representation (including . . . plea bargains in criminal prosecutions)"). Therefore, the Court will assess the conduct of counsel in light of his client's limited capacity to understand and process information.

A mentally impaired client has a "diminished ability to understand and process information." *Atkins v. Virginia*, 536 U.S. 304, 318 (2002). Advice that might enable a defendant of average intelligence to meaningfully participate in the case could be insufficient when given to a mentally disadvantaged defendant. As a result, an attorney may have to take extra care and increased precautions when working with an impaired client. *See id; In re Witte*, 615 S.W.2d 421, 422 (Mo. 1981) ("For every degree that [counsel] by his testimony and evidence proved a less than normal mental and functional capacity of his client, [. . .] he raised by an equivalent degree the standard of conduct which this Court must require of him in his dealings with his client."); MODEL CODE OF PROFESSIONAL RESPONSIBILITY EC 7-12 (1981)

9

("Any mental or physical condition of a client that renders him incapable of making a considered judgment on his own behalf casts additional responsibilities upon his lawyer.").

Here, Matlaga's communication with Petitioner about a guilty plea needed to adequately account for Petitioner's severe mental problems and diminished ability to understand and process information to ensure that Petitioner could "make informed decisions regarding the representations." N.J. RPC 1.4(c).

### b. Severity of Petitioner's Impairment

Matlaga seemed to believe that his experts determined that Petitioner was competent to stand trial. However, the record demonstrates that Petitioner had diminished mental capability and emotional capacity. Petitioner's IQ falls within the level of "borderline retardation." *See* App. at 20. Petitioner's expert also found that Herrera-Genao's mental impairments included difficulty remembering and processing new information. This diminished memory and processing ability made it difficult for Petitioner to fully function in many instances in his life, causing him to fail the sixth grade multiple times and to fail the military exam three times. Doc. No. 28 at 21, 22.

Petitioner had severe emotional issues as well. Dr. Greenwald found that Petitioner suffered from major depression with psychotic features, post-traumatic stress disorder, and a personality change caused by brain trauma. App. at 186. Herrera-Genao also experienced auditory hallucinations and attempted to commit suicide. App. at 186-87. Petitioner's severe emotional problems may have made it even more difficult for Petitioner to connect with counsel to adequately understand a defense. Matlaga made notes throughout his representation of Petitioner, and his notes stated that Herrera-Genao was "nuttier than a fruitcake" and on "another planet." *See* App. at 31.

10

As a result of Herrera-Genao's impairments, Matlaga needed to provide additional care and attention to Petitioner and take additional steps to ensure his client understood his options clearly. *See* Doc. No. 28 at 28 (competency experts found that Petitioner needed guidance through the legal process in order to stand trial); *Atkins*, 536 U.S. at 320 (finding, in the capital punishment context, that memory and processing disabilities make defendants "less able to give meaningful assistance to their counsel" and less able to "process the information of execution as a penalty").

### c. *Counsel's Performance in the Face of Petitioner's Impairments*

The record suggests that Matlaga provided somewhat confusing advice and failed to maintain the consistent, clear communication Petitioner needed to understand his options. Counsel's advice on Herrera-Genao's insanity defense was inconsistent and seemingly confused with the competency issue. Before being retained in this matter, Matlaga had many years of experience as a defense attorney in the state court system. Matlaga was conscientious and apparently sincere in his representation of Petitioner. However, this case was Matlaga's first federal criminal trial, and he appeared to either misinterpret or conflate the standards for competency with insanity in the federal system. Doc. No. 28 at 87; App. at 217-218. For instance, in deciding to waive a competency hearing, Matlaga advised the Court that Petitioner did not meet the standard for incompetence; however, in his explanation of competency, Matlaga quoted the definition of insanity. App. at 217-18. Matlaga also cited expert reports that found Petitioner competent to stand trial when explaining his reasons for not pursuing the insanity defense. App. at 220-22. This apparent confusion may have prevented counsel from rendering clear advice concerning the insanity defense to his client.

It is also unclear whether Matlaga's advice adequately informed Petitioner of the case's strength. Counsel told Petitioner that the insanity defense was "very weak" several times and urged Petitioner not to rely on the insanity defense and to take the plea instead. App. at 253. This information could have alerted someone of average mental abilities to the slim chance of the insanity defense's success. However, someone of Petitioner's mental capacity would have much greater difficulty interpreting an assessment that the insanity defense was "very weak." In particular, someone of Petitioner's mental capacity would have greater difficulty distinguishing between a defense that a jury may not believe and a defense that may be foreclosed from the jury by a judicial ruling. Petitioner's ability to understand and appreciate the complexities of the legal process, such as whether evidence of a defense could be barred before trial, was evidently very thin. *See* Doc. No. 28 at 25.

Despite his conscientiousness, Matlaga also failed to maintain communication with Petitioner. A "lawyer must take any steps necessary in the proper handling of the case," including "the maintenance of communication with the client." *Ziegelheim v. Apollo*, 128 N.J. 250, 261 (1992). Because of problems with Herrera-Genao's jail relocation, for a period of roughly five months, Matlaga did not discuss the plea offer idea or refresh Petitioner's memory on the strength of his insanity defense. Doc. No. 28 at 111. During that period, Matlaga did make several unsuccessful attempts to contact Petitioner. However, it is likely that a client with severe mental problems would need more consistent communication and contact with his attorney. *See* App. 206 (Petitioner's performance "indicates a rapid rate of forgetting auditory information" and Petitioner "will likely experience significant difficulty in retaining auditory information after an interval of time.").

Based on the parties' written submissions and testimony and for the reasons set forth above, the Court finds that counsel's advice did not provide an opportunity for Petitioner to make an adequately informed decision about whether to go to trial, and, therefore, counsel's performance fell sufficiently below the "objective standard of reasonable professional assistance." *Strickland*, 466 U.S. at 687–94.

B. *Prejudice*

For Petitioner to prevail on an ineffective assistance of counsel claim, he must show not only that his counsel's performance fell below an objective standard of reasonable professional assistance, but also that counsel's deficient performance caused prejudice in the outcome of the proceedings. *Strickland,* 466 U.S. at 694. To prove prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id*. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

Here, Petitioner claims prejudice on the grounds that he would have accepted the substantially shorter 45/37 offer but for Matlaga's ineffective representation during the plea negotiation process. In the context of a plea rejection attributed to counsel's deficient performance, a petitioner may establish prejudice by demonstrating that "he would have likely received a lower sentence" by pleading guilty rather than proceeding to trial. *See U.S. v. Booth*, 432 F.3d 542, 546–47 (3d Cir. 2005). In addition, petitioners must also show the following: (1) a plea offer existed; (2) Petitioner would have accepted that plea offer; (3) the prosecution would not have canceled the plea offer; and (4) the trial court would have approved the plea offer. *See Lafler v. Cooper*, 132 S. Ct. 1376, 1385 (2012); *Missouri v. Frye*, 132 S. Ct. 1399, 1409 (2012); *U.S. v. Seeley*, 574 Fed. App'x 75, 80 (3d Cir. 2014); *Enright v. U.S.*, 347 F. Supp. 2d 159, 165

13

(D.N.J. Dec. 10, 2004) (stating that a habeas petitioner "must prove that a plea offer was extended by the government, and that a reasonable probability exists that he would have accepted the plea offer and the court would have approved the agreement").

    i.    <u>Was there a Plea Offer?</u>

The Government argues that Petitioner cannot prove prejudice because the U.S. Attorney's Office only engaged in preliminary discussions regarding a plea idea and never supplied Petitioner or his counsel with a firm offer.

The existence of a plea offer is a factual determination. *See Guerrero v. United States*, 383 F.3d 409, 417 (6th Cir. 2004). Plea offers are examined under the same standards as other contracts. *Puckett v. United States*, 556 U.S. 129, 137 (2009); *United States v. Moscahlaidis*, 868 F.2d 1357 (3d Cir. 1989); *United States v. Odachyan*, No. 11-50253, 2014 WL 1491885 (9th Cir. Apr. 17, 2014). Plea offers, like other contract offers, may be made orally.[5] *United States v. Sanchez*, 562 F.3d 275, 280 (3d Cir. 2009) (overruled on other grounds) ("Just as contracts are not invalid simply because they are made orally, the same is true of plea agreements."); *Brown v. Poole*, 337 F.3d 1155, 1159 (9th Cir. 2003) ("The terms of oral plea agreements are enforceable").

---

[5] In *Frye*, the Supreme Court ruled that "defense counsel has the duty to communicate the terms of a formal offer" to his client. *Missouri v. Frye*, 132 S. Ct. at 1408. The offer in *Frye* was written, so the Court did not specifically address whether an attorney has the duty to communicate an offer that is not in writing. *See id.* ("[a]ny exceptions to that rule need not be explored here, for the offer was a formal one with a fixed expiration date"); *see also Overstreet v. Wilson*, 686 F.3d 404, 407 (7th Cir. 2012) *cert. denied*, 133 S. Ct. 2735 (2013) ("we assume, again without deciding, that counsel's duty to communicate potential bargains to their clients covers oral offers"). However, the Supreme Court's language suggests that formal offers can be oral and that the Court did not find a relevant distinction between oral and written offers. *Id.* at 1409 (citing N.J. Ct. Rule 3:9-1(b) (2012) ("States may elect to follow rules that all offers must be in writing.")).

Here, the U.S. Attorney's Office in the District of New Jersey apparently had an internal policy to record plea offers in writing. Petitioner does not show that a written plea offer was ever made to him. However, Matlaga, Petitioner, and Attorney Furlong (counsel for codefendant Wilfredo Berrios) testified that they believed there was an oral offer through which the defendants could plead guilty and receive a likely sentence of roughly 45 years. *See, e.g.*, App. at 154 (Matlaga's summary of plea discussions with AUSA Charles McKenna); App. at 306 (Furlong: "There was certainly a verbal offer that was communicated to me regularly, right up until the day of jury selection."). Petitioner also claims that Matlaga's actions prior to trial suggest that a plea offer had been made. First, Matlaga wrote the plea idea down while attempting to explain it to Petitioner. App. At 253. Second, during a hearing conducted before trial, at which the Government was present, Matlaga stated that Petitioner faced "45 years for a plea," suggesting that he was considering a plea offer made by the Government. App. at 306. There is no record that the Government attempted to respond to or correct Matlaga's statement that a 45-year plea had been offered. However, while this evidence could be construed to support the existence of a plea offer, it is also consistent with the Government's claims that only preliminary discussions of a plea offer occurred and that no formal offer was ever made.

During the June 26, 2014 hearing, McKenna testified that he never made an oral or written plea offer and that he only engaged in exploratory discussions with defense counsel regarding the possibility of pleading guilty. McKenna stated his discussions with Petitioner's counsel were only the first step in the offering process. According to McKenna, if Petitioner had been willing to entertain the plea offer idea, then McKenna would then have sought the approval of the victim's family, the FBI, and the U.S. Attorney for the District of New Jersey, Christopher Christie, before making an actual offer.

15

Based on the evidence in the record, the Court cannot find that a definitive plea offer existed. It appears that McKenna only discussed with counsel the possibility of Petitioner pleading guilty on the condition that a plea idea was approved. In light of the above, the plea idea was subject to too many contingencies for the Court to find that a formal plea offer existed.

    ii.    <u>Would Petitioner have Accepted that Plea Offer?</u>

In addition to showing the existence of a plea offer, Petitioner must also show "a reasonable probability that, but for counsel's unprofessional errors," he would have accepted the plea offer actually presented by the Government. *See Rainey v. Varner*, 603 F.3d 189, 203 (3d Cir. 2010). It is "difficult for any court to determine in hindsight whether a criminal defendant would have pled guilty had he received competent advice from counsel." *Meyers v. Gillis*, 142 F.3d 664, 668 (3d. Cir. 1998). However, "that difficulty cannot restrict our analysis nor cause us to deny relief that is otherwise appropriate and required under law." *Id*. The "ultimate focus must be on the fundamental fairness of the proceeding." *Rainey*, 603 F.3d. at 198.

Here, Petitioner argues that, had he understood the weakness of his case, he would have accepted a 45/37 plea offer. However, the record shows that Petitioner was unwilling to accept any offer that exposed him to 37 or 45 years of imprisonment. Petitioner apparently refused the 45/37 plea idea presented by McKenna and also informed his counsel on numerous occasions that he would only take a plea offer that was less than 25 years. App. at 153 (Petitioner's "position [. . .] consistently was that he wanted to go to trial," unless he got a plea of less than 25 years.); App. at 28 (Petitioner wanted to plead guilty to a "fair" plea). Counsel's contemporaneous notes from February 11, 2008 also suggest that Petitioner would not take a 45/37 offer. Doc. No. 31 at 10 ("I told [Petitioner] that he simply cannot risk 110 years (minimum) with a trial. He agreed that he can't go to trial, but he wants 10 to 25 years.").

Defense counsel testified that on March 3, 2008, he tried to impress upon Petitioner that he should accept any reasonable offer from the Government because "[t]rial would be suicide. 110 years minimum." Doc. No. 31 at 10-11. Despite these warnings, Petitioner evidently continued to refuse the 45/37 offer idea. While Petitioner argues that this refusal was based on a mistaken view of the case's strength, Petitioner has failed to demonstrate that the "very weak" probability of the insanity defense's success was enough to cause Petitioner to reject a 45/37 year offer and risk 65 to 73 more years predicted by his attorney. Doc. No. 31 at 21 (Matalga: "Did he ever say if worse comes to worse, I'll take the 45? No, never at any time."). For the reasons set forth above, the Court finds that Petitioner has not demonstrated that, but for counsel's actions, there is a reasonable probability he would have accepted the 45/37 plea idea.

Accordingly, the Court finds that Petitioner has not shown the existence of a plea offer nor a reasonable probability that but for counsel's errors, Petitioner would have accepted the contemplated plea offer had it been presented.[6] Thus, Petitioner has failed to show prejudice with respect to his claim of ineffective assistance based on the plea negotiations.

### 3. Failure to Sever Claim

Petitioner's original petition also alleges that counsel erred when he failed to sever Petitioner's trial from his codefendants' trial. Doc. No. 1. Petitioner claims that, had counsel severed the trial, any potential requirement that all defendants accept the plea (the "all-take requirement") would have been lifted, and Petitioner would have been able to accept the plea

---

[6] Since the Court finds that Petitioner has not established the existence of a plea offer nor that he would have accepted such an offer had he received adequate assistance of counsel, it is unnecessary to further examine whether an offer would have been withdrawn by the prosecution or accepted by the Court.

offer. However, Petitioner supplied no additional explanation of this argument in his supplemental briefing. Doc. Nos. 30, 32.

Petitioner fails to show both that defense counsel was deficient and that Petitioner suffered prejudice with respect to these allegations. First, Petitioner provides no support of or explanation for his argument that the case could have been severed. "Rule 14 authorizes a trial court to sever counts or defendants where [. . .] joinder would result in a 'manifestly unfair trial.'" *United States v. Giampa*, 904 F. Supp. 235, 265 (D.N.J. 1995) (internal citations omitted). Petitioner does not show why the trial would have been "manifestly unfair" and supplies no facts upon which the trial court could have relied in granting this request. Second, Petitioner fails to show that, had the case been severed, the outcome would have been different. In order to show prejudice here, Petitioner must show that the Government would have lifted the "all-take" requirement had the case been severed. However, Petitioner provides no basis for this possibility, and the Court finds no evidence in the record to support this claim. Finally, Petitioner has not overcome the presumption that the decision to participate in a joint trial was a strategic choice. *See Strickland*, 466 U.S. at 6890 ("the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy'"); *Id.* at 690–91 (strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable"). For the reasons set forth above, the Court finds that Petitioner's ineffective assistance claim based on the lack of severance fails.

### 4. Decision to Waive the Competency Hearing

In his supplemental briefing, Petitioner appeared to claim that counsel was ineffective for waiving, or otherwise not pursuing, a competency hearing. On June 28, 2013, the Court requested additional information regarding whether the decision to waive a competency hearing

18

rendered trial counsel's assistance ineffective. Doc. No. 35. After considering the testimony and written submissions, the Court finds that Petitioner cannot prevail on this claim.

First, in his June 17, 2013 filing, Petitioner stated that he was not raising this issue. (Doc. No. 32 at fn 3) ("Petitioner does not assert that his failure to [pursue incompetency] rises to the level of ineffective assistance. Nor does he assert that he ultimately could show that, at the time of trial, he was incompetent."). Second, the claim was not timely raised. Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a criminal defendant has one year to file a request for relief under § 2255. *See* 28 U.S.C. § 2255(f). Under the AEDPA, a second or successive petition must be certified by the court of appeals and is only available under certain circumstances. *See* 28 U.S.C. § 2255(h). Here, the competency claim was not included in a single petition, and Petitioner has not received certification from the court of appeals. Instead, Petitioner alleges that this claim relates back to the original claim. However, Petitioner's ineffective assistance claim based on the plea discussions concerns events that occurred nearly a year after the competency hearing should have taken place and relates to the decision not to accept the plea rather than to the decision to waive a competency hearing. Therefore, Petitioner's claim of ineffective assistance based on the failure to seek a competency hearing does not relate back and is barred under the AEDPA. *See Mayle v. Felix*, 545 U.S. 644, 649–50 (2005) (explaining Federal Rule of Civil Procedure 15(c)(2)'s relation back provision in the context of a habeas petition).

## CONCLUSION

For the reasons set forth above, Herrera-Genao's habeas petition will be denied.

*/s/ Anne E. Thompson*
ANNE E. THOMPSON, U.S.D.J.
